Filed 5/15/13  P. v. Amaya CA2/5
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B231525 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA10203) |
| v. | |
| TOMAS AMAYA, Jr. et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of the County of Los Angeles, Paul A. Bacigalupo, Judge.  Affirmed.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Tomas Amaya, Jr.

Sharon Fleming, under appointment by the Court of Appeal, for Defendant and Appellant Aldo Arevalo.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Tomas Amaya (Amaya) guilty of first degree murder and defendant and appellant Aldo Arevalo (Arevalo) guilty of second degree murder and assault by means of force likely to produce great bodily injury. On appeal, Arevalo raises several challenges to his judgment of conviction, including claims of insufficient evidence, multiple instructional errors, ineffective assistance of counsel, cumulative error, and cruel and unusual punishment. In addition, Amaya, joined by Arevalo, contends that punishment on both the murder count and the weapons enhancement violated California's multiple conviction rule and federal double jeopardy principles.

We hold that there was sufficient evidence supporting the guilty verdicts on both counts against Arevalo, his claims of instructional error are either unfounded or have been forfeited, and his other contentions are without merit. As for the punishment on both the murder count and the weapons enhancement, we hold that such punishment did not violate the multiple conviction rule and that double jeopardy rules do not apply to multiple punishment within a single case. We therefore affirm the judgments of conviction.

## FACTUAL BACKGROUND

In July 2009, sixteen-year old Kevin Sanchez lived in the area of 105th Street and Wilmington Avenue. Sanchez, whose moniker was Drowsy, was a member of the Watts Varrio Grape Street gang (Grape Street) and was affiliated with the Little Gangsters and Tiny Winos cliques.

On the day of the shooting, Sanchez walked to A.J.'s liquor store. As he came out of the store, Sanchez noticed Jorge Hernandez (the victim) arrive in a truck. He observed the victim drinking beer by his truck. The victim, who smelled of beer, approached Sanchez, "banged on him, [and] asked [him] where he was from." When Sanchez said he

was from "Grape," the victim responded that he too was from "Grape." The victim "tried to get all in [Sanchez's] face. He [said] he was [Sanchez's] big homie." Because Sanchez did not know the victim, he understood the "big homie" comment as a sign of disrespect. When the victim called Sanchez his "little homie," Sanchez denied being his "little homie." The victim then "got in [Sanchez's] face" again, so Sanchez pushed him and challenged him to fight. Sanchez told the victim he was drunk and to "come back tomorrow and . . . talk to [Sanchez] sober." Sanchez also asked the victim if he was trying to kiss him. In response to Sanchez's challenge to fight, the victim again called Sanchez his "little homie" and told Sanchez that he was too young to fight the victim. Sanchez renewed his challenge to fight, took off his shirt, and "threw [his] guard up . . . ." When the victim refused to fight, Sanchez taunted, "You bitch, you don't want to fight me[?]"

Because the victim refused to fight, Sanchez began to walk home on Wilmington Avenue toward 105th Street. When he arrived at the corner of 105th Street, the victim pulled up in his truck, called Sanchez "little homie" yet again, and said he would be back. When Sanchez's friend Mario[1] arrived at the corner on his bike, the victim said to him, "I know you, I got love for you," which statement Sanchez interpreted as an expression of respect toward Mario, as if the victim "knew [Mario] real good." Mario responded by telling the victim to go home, that everybody knew he was drunk because he had been drinking in front of the store, and that the victim could come back tomorrow to talk to him. Sanchez issued another challenge to fight, and warned the victim that if he did not fight, Sanchez would tell the victim's clique that he "chickened out . . . ."

The victim's truck "burned rubber" as he left the scene. According to Sanchez, the victim was driving as "if it was a freeway" and there were "a lot [of] kids" on that block. As the victim's truck passed close to Amaya, who was located down the block,

---

[1]    Los Angeles Police Detective Roger Fontes testified that a photograph from a security video depicting the events around the liquor store leading up to and including the shooting showed a male on a bicycle at the scene named Mario Lezeola.

3

Sanchez saw Amaya throw a beer at the truck. Sanchez then heard the victim's truck "burning rubber or [doing] donuts, like doing circles," in the street on the next block.

In July 2009, Yvette Aguirre was Arevalo's girlfriend. She knew Arevalo by the nickname Little Knuckles and Amaya by the nickname Chuco. On July 19, 2009, Aguirre owned a blue, four-door Toyota Camry in which she drove Arevalo to his brother's house on 105th Street near Wilmington Avenue. She parked on 105th Street, and, at some point Amaya joined them in her car. They "were just hanging out drinking [beer]." Aguirre saw an SUV pull over near the corner of 105th Street and Wilmington Avenue. A man exited the vehicle and began "arguing with some [teenagers]," presumably Sanchez and Mario. The man appeared to be drunk. Amaya exited the Camry and approached the SUV. As he approached, the SUV "took off." The teenagers chased the SUV and Amaya threw a beer can at it. Aguirre asked Arevalo "what was going on" because she was confused "about the whole situation." She told Arevalo that she wanted to leave. After Amaya threw the beer, she saw him talk to the teenagers. Arevalo then exited the Camry and walked toward Amaya's location.

Amaya and Arevalo returned to the Camry, with Arevalo taking the front passenger seat and Amaya taking the rear seat. Another person, whose name Aguirre could not recall, also entered the Camry. Aguirre then drove the group to A.J.'s liquor store on Wilmington Avenue and "pulled in front . . . ." There she saw the victim's SUV parked on the opposite side of the street. Amaya exited the Camry, followed closely by Arevalo. As Amaya approached the SUV, Aguirre saw Amaya extending his right arm. She could not remember whether Amaya had anything on his face. Amaya approached within three or four feet of the SUV. Aguirre saw a red car arrive at the scene and then she saw Amaya shooting at the SUV. After the shooting, Amaya entered the red car and left. Arevalo entered the Camry, and Aguirre drove him to 105th Street where Amaya reentered the Camry and directed Aguirre "[t]o just get him out of there" and to drive to a restaurant. As the trio sat in the restaurant, Amaya stared at Aguirre which intimidated

4

her.  Arevalo appeared "pretty afraid."  Aguirre thereafter drove Amaya to a house and dropped him off.[2]

Robleon Thomas was talking with some people he knew in front of A.J.'s liquor store on the day the victim was shot.  The victim was across the street from the store in his SUV.  At some point, Thomas observed other cars "pull[] up."  He saw a man wearing a blue bandana exit a car and approach the victim's SUV.  Two other men exited the car along with the man in the bandana.  As the man in the bandana approached the SUV with a revolver, Thomas saw the victim begin to open his door and then throw up his hands "in a retreat manner."  Thomas heard approximately six gunshots.  The two men who exited the vehicle with the shooter appeared shocked.  Following the shooting, Thomas went to the SUV and saw the victim slumped over.

On July 19, 2009, Jeffrey Rencher was on the east side of Wilmington Avenue across from A.J.'s liquor store talking to some friends.  He noticed an SUV parked on the same side of the street.  Rencher was about five car lengths away from the SUV.  He heard gunshots and dropped to the ground.  He then stood up and ran to 106th Street.  When he returned to the scene of the shooting, he noticed the SUV had rolled "on top of [his nephew's] car."

On July 19, 2009, Augustin Gonzales was driving southbound on Wilmington Avenue near 107th Street.  "A couple of cars stopped ahead of [him]."  He saw a "Blazer" being cut off by a burgundy car going southbound.  "Some guys got out of [the] burgundy car" and started shooting at the person in the Blazer.  Gonzales reversed direction, but so did the burgundy car.  He thought it was following him, but when he pulled into a driveway, the burgundy car passed him and pulled over about 100 yards away.  He saw someone exit the passenger side of the vehicle and run north through some houses.  Gonzales returned to the scene and photographed the victim's SUV.

---

**2**      During direct examination, Aguirre viewed portions of a security videotape depicting the events around the liquor store leading up to and including the shooting.  She identified both Amaya and Arevalo on the videotape.

In July 2009, Los Angeles Police Officer Tyler Stanley was assigned to the southeast division. On July 19, 2009, at approximately 6:20 p.m., he and his partner were on patrol in the area of Wilmington Avenue and 103rd Street. A car pulled up beside them and reported a shooting. He and his partner made a u-turn and proceeded to the area of 107th Street and Wilmington Avenue. At that location, they observed "a vehicle that was on the east side of the street up on the sidewalk, [and] there was a lot of commotion around it." Officer Stanley and his partner parked and approached the vehicle on foot. As they reached the vehicle, they saw the victim lying down inside. He was bleeding from several wounds and did not appear to be conscious or breathing. Officer Stanley did not notice any weapons inside the victim's vehicle.

Detective Fontes and his partner Detective Mark Hahn were assigned to investigate the homicide of the victim. According to Detective Fontes, investigators recovered, inter alia, a surveillance videotape of the area near 106th Street and Wilmington Avenue that depicted the events leading up to and including the shooting. A photograph taken from the video showed a red vehicle driving southbound on Wilmington Avenue that the detective later determined was registered to Amaya. Other photographs from the video depicted the victim's vehicle parked along the east side of the street with the door open facing northbound. A different photograph from the video showed a light blue vehicle with individuals exiting the rear and front passenger doors. Another photograph showed Amaya's red vehicle crossing in front of the path of the victim's vehicle. Detective Fontes identified several more photographs taken from the security video that depicted the shooting. Portions of the videotape were also played for the jury during Detective Fontes's testimony.

When Los Angeles Police Detective Mark Hahn arrived at the scene of the shooting, it had been secured. He inspected the victim's vehicle and noted that the center console was closed. The rear tires of the vehicle were up on the sidewalk and it appeared "to be resting on a tree." The front passenger window was rolled all the way down and the front driver's window, which had been shattered, "had some glass that was still in the

6

window." By the time Detective Hahn inspected the victim's vehicle, the victim had been transported to the hospital.

Los Angeles Police Department Criminalist Julie Wilkerson (the criminalist) assisted in the homicide investigation of the July 19, 2009, shooting. She searched the victim's vehicle in the tow yard of the facility to which it had been towed. She had been requested to perform a bullet path analysis and to search for and collect any firearms or bullet evidence. During her search of the inside of the vehicle, the criminalist opened the center console in which she found some papers and then a plastic insert. When she removed the plastic insert, she saw more papers and what looked like a firearm. The papers were both below and on top of the firearm. The firearm she recovered from the console was a BB gun. She also observed blood stains on the left side of the console and the right arm of the driver's seat. But, when she opened the lid to the console, there were no blood stains inside and there was no blood on the BB gun. If the console was closed, the BB gun would be inaccessible because, to access it, the console needed to be opened and the plastic insert removed. On the passenger side of the vehicle, the criminalist located a bull horn on the seat. In the trunk, she found a cardboard beer container and a sunshade. The criminalist used trajectory rods to analyze the pathways of the bullets that struck the victim's vehicle. During direct examination, she identified photographs taken of the trajectory rods.

Los Angeles County Deputy Medical Examiner Vadims Poukens conducted the autopsy of the victim and determined that he died of multiple gunshot wounds. The victim suffered a total of seven gunshot wounds, four of which were fatal, including a gunshot that entered near the victim's left ear and passed through his brain and one that went through his left lung and heart. The victim had cocaine and alcohol in his blood, with a blood alcohol concentration of three times the legal limit.

Los Angeles Police Department Sergeant Scott Stevens testified as a gang expert for the prosecution. He was familiar with Hispanic street gangs generally, and explained how young males joined such gangs. According to Sergeant Stevens, there were various levels of gang membership, from street level soldiers to captains. Gang members

7

typically had tattoos to identify them as members of the gang, as well as monikers. A gang member moved up in a gang based on reputation, and respect within and among gangs was important. Falsely claiming to be a member of a gang would be an ultimate act of disrespect. Acts of disrespect toward gang members could result in beatings or even more violent responses.

Sergeant Stevens was familiar with Grape Street. He had investigated crimes committed by that gang and was familiar with its graffiti and writings. Grape Street controlled a specific territory that was divided among several cliques, including the Little Gangsters and the Tiny Winos. The primary activities of Grape Street were vandalism, possession and sales of narcotics, robberies, homicides, and the possession of firearms.

Sergeant Stevens was familiar with Arevalo and knew him to be a member of Grape Street based on numerous admissions that Arevalo had made. The sergeant was also familiar with Amaya, but had never met him, and understood that he was a member of Grape Street based on Amaya's various tattoos. The sergeant was familiar with Sanchez as well, and knew him to be a member of the Little Gangsters clique of Grape Street. Based on his familiarity with the case, Sergeant Stevens opined that the shooting of victim in this case was done to enhance the reputation of Grape Street and in response to the victim's acts of disrespect toward Grape Street and one of its members, Sanchez.

## PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged Amaya and Arevalo with murder in violation of Penal Code section 187, subdivision (a).[3] The District Attorney alleged that Amaya personally used a firearm; discharged a firearm; and discharged a firearm causing death or great bodily injury within the meaning of section 12022.53, subdivisions (b), (c), and (d). The District Attorney further alleged that a

---

[3]     All further statutory references are to the Penal Code unless otherwise indicated.

8

principal personally: used a firearm; discharged a firearm; and discharged a firearm causing death or great bodily injury within the meaning of section 12022.53, subdivisions (b) and (e), (c) and (e), and (d) and (e). The District Attorney also alleged that the murder was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C). And the District Attorney alleged that Amaya had been convicted of three violent or serious felonies within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i).

Prior to trial, the District Attorney successfully moved to amend the information to charge Arevalo in count 2 with assault by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(4). Following trial, the jury found Amaya guilty of first degree murder and found the firearm and gang allegations true. The jury found Arevalo guilty of second degree murder and assault by means of force likely to produce great bodily injury and found the firearm and gang allegations true. Based on the prosecution's motion, the trial court dismissed the prior strike conviction allegations against Amaya.

The trial court sentenced Amaya to an aggregate term of 50 years to life, comprised of a base term of 25 years to life on count 1, plus an additional, consecutive term of 25 years to life based on the section 12022.53, subdivision (d) firearm enhancement. The trial court imposed but struck the punishment for the remaining firearm enhancements and did not impose sentence on the gang enhancements.

At a separate sentencing hearing, the trial court sentenced Arevalo to an aggregate term of 40 years to life, comprised of a base term of 15 years to life on count 1, plus an additional, consecutive term of 25 years to life based on the section 12022.53, subdivision (d) and (e)(1) enhancement. The trial court imposed but struck the punishment for the remaining firearm enhancements and did not impose sentence on the gang enhancement.

9

## A.    Substantial Evidence

### 1.    Standard of Review

Arevalo's challenge to the sufficiency of the evidence in support of the jury's guilty verdicts on second degree murder and assault by means of force likely to produce great bodily injury is governed by a substantial evidence standard of review.  "In assessing . . . a claim [of insufficient evidence], we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)  'The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.)'  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618] (*Rodriguez*).)  [¶]  Moreover, as observed in *Rodriguez*:  'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792 [42 Cal.Rptr.2d 543, 897 P.2d 481].)  "'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt.  "'*If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal*

10

*of the judgment*.'" [Citations.]'" [Citation.]' (*Rodriguez, supra*, 20 Cal.4th at p. 11, italics added; see generally *People v. Clark* (2011) 52 Cal.4th 856, 942-943 [131 Cal.Rptr.3d 225, 261 P.3d 243] (*Clark*), and cases cited.)" (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.)

### 2. *Count 1 – Second Degree Murder*

According to Arevalo, the jury found him guilty of second degree murder based on an accomplice theory under the natural and probable consequences doctrine, but the evidence did not show that Arevalo knew or should have known that the shooting was a probable consequence of the target crime of assault by means of force likely to produce great bodily injury. In the alternative, Arevalo argues that the evidence was insufficient to show that he committed the target crime of assault by means of force.

It appears the jury found Arevalo guilty of second degree murder based on the prosecution's alternative accomplice theory of liability under the natural and probable consequences doctrine. Under that alternative theory, the prosecutor argued that Arevalo aided and abetted the commission of a gang assault of the victim and Amaya's shooting of the victim during the commission of the assault was a natural and probable consequence of the assault for which Arevalo was also liable.

"'"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' (*People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].) Furthermore, under the '"natural and probable consequences"' doctrine, an aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage, but also any reasonably foreseeable offense committed by the person he or she aids and abets. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) [¶] . . . [¶] In *Prettyman*, we summarized the natural and probable consequences doctrine as follows: 'Under California law, a person who aids and abets a confederate in

11

the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a "natural and probable consequence" of the crime originally aided and abetted. To convict a defendant of a nontarget crime as an accomplice under the "natural and probable consequences" doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime. The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a "natural and probable consequence" of the target crime that the defendant assisted or encouraged.' (*Id.* at p. 254.)" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295-96, 298-299)

In *People v. Medina* (2009) 46 Cal.4th 913, the Supreme Court analyzed and approved two appellate court decisions which held that murder is a natural and probable consequence of a gang assault. "In *People v. Montes* [(1999)] 74 Cal.App.4th 1050, the victim was shot as he was retreating from a fight between two rival gangs. Although the defendant struck the victim (a rival gang member) with a chain after the victim produced a knife, no guns were displayed or used during the fight. As the victim was about to drive off after the fight ended, the defendant's confederate retrieved a gun from a nearby vehicle, ran up to the victim, and shot him several times. Rejecting the defendant's argument that he did not know his confederate had a gun, the *Montes* court held that the homicide was a reasonable and natural consequence of the gang attack in which the defendant participated. It reasoned that escalating violence is a foreseeable consequence to be expected in gang confrontations. (*People v. Montes, supra*, 74 Cal.App.4th at p. 1056.)" (*People v. Medina, supra,* 46 Cal.4th at pp 926-927.)

"In *People v. Montano* [(1979)] 96 Cal.App.3d 221, the court found the defendant guilty of attempted murder as an aider and abettor even though he had not fought with the victim. There, the defendant and a codefendant tricked a member of another gang into getting in their car by claiming to be members of the same gang. They drove the victim

12

to a remote area where another codefendant met them. The two codefendants ordered the victim out of the car and escorted the victim to a nearby tree, while the defendant remained inside the car. The first codefendant produced a handgun and gave it to the second codefendant, who shot the victim. At the urging of the first codefendant, the second codefendant shot the victim again. Defendant argued there was insufficient evidence to support his attempted murder conviction as an aider and abettor; he contended he had only aided or encouraged a battery by suggesting the beating of the victim and had had no knowledge of his codefendant's intent to shoot the victim. [¶] The *Montano* court rejected the argument, reasoning that 'The evidence was clear that the attack upon [the victim] was an aspect of gang warfare and that he was attacked on the basis of his membership in the rival . . . gang. The frequency with which such gang attacks result in homicide fully justified the trial court in finding that homicide was a "reasonable and natural consequence" to be expected in any such attack. It is, therefore, clear that [the defendant's] guilt of aiding and abetting an attempted murder does not depend upon his awareness that [either codefendant], or both of them, had deadly weapons in their possession.' (*People v. Montano, supra*, 96 Cal.App.3d at p. 227.)" (*People v. Medina, supra*, 46 Cal.4th at pp. 926-927.)

When the evidence in this case is viewed in a light most favorable to the prosecution, as it must be under the substantial evidence standard discussed above, it supports the jury's verdict finding Arevalo guilty of second degree murder. Sanchez and Arevalo each admitted that they were Grape Street gang members, and based on Amaya's tattoos, the gang expert testified that Amaya, the shooter, was also a member of that same gang. The victim, who had three times the legal limit of alcohol in his blood, engaged in a gang-related confrontation with Sanchez in front of the liquor store. According to Sanchez, he felt disrespected by the victim's claim that the victim was a Grape Street gang member, and the expert confirmed that such a false claim of gang membership was an ultimate act of disrespect toward the gang.

The gang-related confrontation between Sanchez and the victim renewed at a street corner near where Amaya and Arevalo were drinking beer in Aguirre's Camry. At

13

some point, Sanchez was joined on that corner by his friend, Mario. When the victim attempted to address Mario with an expression of respect, Mario responded in a confrontational manner, as Sanchez had done earlier at the liquorstore, telling the victim he—the victim—was drunk and to return the next day when he was sober.[4] Upon witnessing the street corner confrontation, Amaya exited the Camry and approached the corner, evidence that supported an inference that he intended to come to the aid of his younger fellow gang members. When the victim saw Amaya, he sped past Amaya's location as Amaya threw a beer can at him and Sanchez and Mario chased his SUV. Amaya then spoke to Sanchez and Mario and thereafter to Arevalo.

Immediately following the incident at the corner, Aguirre drove Amaya and Arevalo directly to the liquor store where the victim was located, while another person, or other persons, traveled in Amaya's burgundy car to the same location. As soon as they arrived, Amaya and Arevalo exited the Camry and proceeded straight toward the victim in his SUV. To prevent the victim from escaping, the person driving Amaya's car blocked the victim's path. As the victim attempted to back up, Amaya came within three or four feet of the victim's SUV and fired six shots at close range, four of which were fatal. Amaya then fled the scene in his car, later rejoined Arevalo in Aguirre's Camry, and directed the trio to a restaurant where they ate.

The foregoing evidence supported a reasonable inference that, at a minimum, Amaya and Arevalo planned to ambush and assault the victim for a perceived act of disrespect toward their gang and a fellow gang member in their territory. In the course of the ambush and assault, Amaya produced a handgun and shot the victim in a cold-blooded, execution-style murder. Thus, even if Arevalo was unaware of Amaya's intent

---

[4]    The victim's attempt to show respect toward Mario and Mario's confrontational response were similar in nature to the victim's confrontation with Sanchez at the liquor store, which confrontation was clearly gang related. Those facts, when viewed in a light most favorable to the judgments of conviction, supported an inference that Mario was also a member or affiliate of Grape Street who felt disrespected by the victim's false assertion of familiarity, an inference that the prosecutor argued to the jury.

14

to kill—as opposed to assault—the victim, the shooting was nevertheless a natural and probable consequence of the gang assault under the authorities cited above. As those cases teach, such escalating violence was a forseeable consequence that Arevalo should have expected given the gang-related nature of the planned attack.

Arevalo further contends that he should not have been found guilty of murder as an accomplice under a natural and probable consequences doctrine because he did not commit the target crime of assault by means of force. For reasons similar to those that support Arevalo's conviction of second degree murder, we conclude that the evidence supported a reasonable inference that Arevalo committed the target crime. As discussed, Amaya and Arevalo witnessed the street corner confrontation between admitted fellow gang member Sanchez and his friend Mario, on the one hand, and the victim, on the other. Following that confrontation—which included the victim driving dangerously close to Amaya at high speed and Amaya throwing a beer at the victim's vehicle— Amaya spoke to both Sanchez and Mario and then to Arevalo and, almost immediately thereafter, Amaya and Arevalo engaged in what appeared to be a well-coordinated attack on the victim.[5] In addition to Aguirre's Camry in which Amaya and Arevalo arrived at the scene, Amaya's vehicle arrived almost simultaneously to block the trapped victim's escape and facilitate the success of the assault.

That evidence supported a reasonable inference that Arevalo intended to engage in a gang assault on the victim, either directly or as an aider and abettor. That he did not personally commit a battery on the victim is immaterial because, as discussed in detail below, actual physical contact with or harm to the victim is not necessary to support a finding of assault. (See *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) The focus is

---

[5]     As discussed, Detective Fontes testified that the male on the bicycle depicted at the scene of the shooting on the photograph from the security video was named Mario. From that evidence, the jury could have reasonably inferred that the male in the photograph was Sanchez's friend Mario who arrived at the scene of the shooting shortly before the ambush took place.

15

on whether the means employed was *likely* to produce great bodily injury. (*Ibid.*) Here, the victim's assailants blocked his escape and Amaya, with Arevalo and another man at his side, proceeded directly to the victim's truck, evidence that supported an inference that they intended, at a minimum, to engage in a physical assault on the victim which assault, given their superior numbers and proximity to the trapped victim, was likely to inflict great bodily injury.

      2.    *Count 2 – Assault By Means of Force Likely to Produce Great Bodily Injury*

In support of his claim that there was insufficient evidence to support the jury's guilty verdict on count 2—assault by means of force likely to produce great bodily injury—Arevalo asserts that there was no evidence he committed any act that was likely to result in a battery of the victim and that he could not have aided and abetted in the assault of the victim because no one else committed any act likely to result in a battery of the victim.

"[Former] [s]ection 245, subdivision (a)(1), punishe[d] assaults committed by the following means: . . . by 'any means of force likely to produce great bodily injury.'[6] One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on . . . force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. (See *People v. Wingo* (1975) 14 Cal.3d 169, 176 [121 Cal.Rptr. 97, 534 P.2d 1001].)" (*People v. Aguilar*, *supra,* 16 Cal.4th at p. 1028.)

---

**6**    The offense of assault by means of force likely to produce great bodily injury is currently set forth in section 245, subdivision (a)(4) which provides: "Any person who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."

Section 245, subdivision (a)(4) requires that a defendant commit "an assault upon the person of another . . . ." "An assault . . . is defined in section 240 as 'an unlawful attempt, *coupled with a present ability*, to commit a violent injury on the person of another.' (Pen. Code, § 240, italics added.) [¶] . . . [¶] [B]ecause of the 'present ability' element of the offense, to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim. (Thus, the emphasis is on the word 'present' as much as the word 'ability.') The policy justification is apparent. When someone has gone this far he is a greater and more imminent threat to his victim and to the public peace than if he is at an earlier stage of an attempted crime." (*People v. Valdez* (1985) 175 Cal.App.3d 103, 108, 112.)

As discussed, the evidence supported a reasonable inference that Arevalo intended either to engage directly in a gang assault on the victim or to aid and abet such an assault. Gang members Amaya and Arevalo witnessed the gang-related street corner confrontation and, after speaking with fellow gang members Sanchez and Mario, proceeded directly to the liquor store across from which the victim was parked. Aguirre parked her Camry across from the victim's vehicle, and Amaya, Arevalo, and a third man proceeded straight toward the victim while another person driving Amaya's car blocked the victim's escape. Amaya, with Arevalo at his side, moved within three or four feet of the victim's vehicle, evidence that supported a reasonable inference that Arevalo not only intended to engage in or support the gang attack, but also that he had the present ability to do so. The victim was, in effect, trapped, and Arevalo and his confederates outnumbered him at least three to one, suggesting that the planned assault was likely to produce great bodily injury.

17

## B.    Claimed Instructional Errors

### 1.    *Simple Assault as Lesser Included Offense of Assault by Means of Force Likely to Produce Great Bodily Injury*

Arevalo contends that because the evidence supported a reasonable inference that he intended to engage only in the lesser included offense of simple assault, he was entitled to a sua sponte jury instruction on that lesser included offense.  According to Arevalo, the evidence did not establish a felony assault to the exclusion of simple assault because Arevalo was not armed with any weapon and there was no evidence as to what a gang "beat down" would entail.

"'A court must generally instruct the jury on lesser included offenses whenever the evidence warrants the instructions, whether or not the parties want it to do so.  [Citation.]' (*People v. Horning* (2004) 34 Cal.4th 871, 904-905 [22 Cal.Rptr.3d 305, 102 P.3d 228] (*Horning*); see *People v. Valdez* (2004) 32 Cal.4th 73, 115 [8 Cal.Rptr.3d 271, 82 P.3d 296].)  '[T]he sua sponte duty to instruct on lesser included offenses, unlike the duty to instruct on mere defenses, arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued.' (*People v. Breverman* (1998) 19 Cal.4th 142, 162 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)" (*People v. Beames* (2007) 40 Cal.4th 907, 926.)  "[A] trial court, [however,] need not instruct the jury on a lesser included offense where no evidence supports a finding that the offense was anything less than the crime charged.  ([*People v. Barton* (1995) 12 Cal.4th 186,] 196, fn. 5; see *People v. Breverman*[, *supra,*] 19 Cal.4th [at p.] 149; *People v. Anderson* (1983) 144 Cal.App.3d 55, 61 [192 Cal.Rptr. 409].)" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.)

The prosecution's evidence supported a reasonable inference that Arevalo intended to engage in what the gang expert described as a gang "beat down" of the victim.  Contrary to Arevalo's assertion, there was evidence from the gang expert as to what a gang "beat down" would entail.  When describing how gang members are "jumped in," i.e., admitted, to a gang, the expert explained that a "group of guys beat you

18

down in an alley." And when describing the role of "street level soldiers" within a gang, the expert said that they engaged in, inter alia, "retaliatory strikes" and administered "gang punishment." The expert also explained that the punishment for snitching, a serious offense, could be an "old fashioned beat down" and that the victim's offense in this case—falsely claiming to be a Grape Street gang member—was also considered a very serious offense that, depending on the "extent of the insult," would likely "end violently" in a "beat down."

From that expert testimony and the facts relevant to the assault, the jury could reasonably infer that the gang "beat down" in which Arevalo intended to engage would have been a violent physical beating administered by at least three gang members. Arevalo offered no evidence to the contrary. Based on that evidence, no reasonable juror could have concluded that Arevalo intended to engage in a simple assault. As a result, the trial court had no sua sponte duty to instruct on the lesser included offense of simple assault.

### 2. Voluntary and Involuntary Manslaughter as Lesser Included Offenses of Murder

#### a. Involuntary Manslaughter

Arevalo contends that he was entitled to a jury instruction on the lesser included offense of involuntary manslaughter. He argues that the evidence supported an instruction on simple assault as a lesser included target crime of assault by means of force likely to produce great bodily injury and, if the jury found he had committed a simple assault, the killing of the victim as a consequence of that simple assault would have been involuntary manslaughter.

As discussed above, a trial court does not have a sua sponte duty to instruct on lesser included offenses that are not supported by the evidence. (*People v. Gutierrez, supra,* 45 Cal.4th at p. 826.) Here, as explained, the evidence did not support an instruction on simple assault. Therefore, the evidence also did not support an instruction

19

on involuntary manslaughter.  Rather, the evidence supported a reasonable inference that Arevalo intended to engage in a gang "beat down" of the victim, not a simple assault.

Moreover, even if the evidence supported an instruction on a lesser included target offense of a simple assault, this court has concluded that a trial court does not have a sua sponte duty to instruct on lesser included target offenses under the natural and probable cause consequences doctrine unless those lesser included target offenses are relied upon by the prosecutor.  (See *People v. Huynh* (2002) 99 Cal.App.4th 662, 677-678.)  "Typically, there is a sua sponte duty to instruct on lesser included offenses.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1084, [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Breverman*[, *supra*,] 19 Cal.4th [at p.] 154.)  Under most circumstances, involuntary manslaughter is a lesser included offense of murder.  (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 274; *People v. Edwards* (1985) 39 Cal.3d 107, 116, fn. 10, [216 Cal.Rptr. 397, 702 P.2d 555].)  But the California Supreme Court has held that there is *no* sua sponte duty to instruct on target offenses on a natural and probable consequences aiding and abetting theory unless they are identified by the prosecutor.  In *People v. Prettyman*, *supra*, 14 Cal.4th at page 269, the California Supreme Court described the sua sponte duty to instruct on target offenses in natural and probable consequences aiding and abetting cases as follows:  'We also recognize that "the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly." (*People v. Wade* (1959) 53 Cal.2d 322, 334, [1 Cal.Rptr. 683, 348 P.2d 116].)  But the sua sponte duty to instruct that is imposed here is quite limited.  It arises only when the prosecution has elected to *rely* on the "natural and probable consequences" theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory.  The trial court, moreover, need not identify *all* potential target offenses supported by the evidence, but only those that the prosecution wishes the jury to consider.'  (Fn. omitted, original italics; see *People v. Dawson* (1997) 60 Cal.App.4th 534, 544-545, [71 Cal.Rptr.2d 33].)"  (*Ibid*.)

In this case, the prosecutor did not identify simple assault as a target offense.  The only target offense identified was assault by means of force likely to produce great bodily

injury. As a result, the trial court had no sua sponte duty to instruct on that lesser included target offense.

Arevalo also contends that he was entitled to an involuntary manslaughter instruction because the evidence supported an inference that he committed a noninherently dangerous felony without due caution and circumspection. (*People v. Burroughs* (1984) 35 Cal.3d 824, 835.) "'Due caution and circumspection'" in this context "is equivalent to criminal negligence . . . ." (*Id.* at p. 835, fn. 9.) Here, there was no evidence that either Amaya or Arevalo acted in a criminally negligent manner. The evidence showed that each acted intentionally in connection with the death of the victim—Amaya acted with the specific intent to murder the victim and Arevalo acted, at a minimum, with the specific intent to engage in a gang assault on the victim. Thus, the trial court did not err in failing to instruct on involuntary manslaughter based on criminal negligence.

### b. Voluntary Manslaughter

Arevalo argues that he was also entitled to a jury instruction on voluntary manslaughter under *People v. Garcia* (2008) 162 Cal.App.4th 18 (*Garcia*). Arevalo maintains that *Garcia* recognized a separate theory of voluntary manslaughter, in addition to the well recognized theories of heat of passion and imperfect self-defense.

Contrary to Arevalo's assertion, the issue in *Garcia, supra,* 162 Cal.App.4th 18 did not involve a claim that there was a third theory, beyond heat of passion and imperfect self-defense, upon which to base a conviction for voluntary manslaughter. *Garcia* involved the limited question of whether, under the facts of that case, the defendant was entitled to an instruction on *involuntary* manslaughter as a lesser included offense. (*Id.* at p. 22.) Thus, its holding was limited to that issue, and any discussion of voluntary manslaughter was dictum.

Moreover, even assuming *Garcia, supra,* 162 Cal.App.4th 18 enunciated a new theory of voluntary manslaughter, the evidence in this case did not support an instruction on that theory as a lesser included offense of murder. The jury found that Arevalo

21

committed an assault by means of force likely to produce great bodily injury, and, as noted, that finding was supported by substantial evidence. The jury also found, based on substantial evidence, that the intentional, premeditated killing of the victim was a natural and probable consequence of the assault. Thus, contrary to Arevalo's assertion, there was no evidence that Arevalo failed to appreciate the potential lethality of his conduct. To the contrary, the jury found by substantial evidence that he should have expected that escalating violence, including murder, would be a natural and probable consequence of the gang "beat down" in which he intended to engage. Based on that evidence and finding, there was no sua sponte duty to instruct on voluntary manslaughter.

### 3. Natural and Probable Consequences Theory

Arevalo argues that the trial court erred by instructing the jury on the natural and probable consequences doctrine because there was insufficient evidence that he committed the target crime of assault by means of force likely to produce great bodily injury. Because we have previously rejected, in the context of other claims of error on appeal, Arevalo's contentions concerning the sufficiency of the evidence in support of assault by means of force, we conclude that this claim of instructional error is unfounded.

### 4. CALCRIM No. 402

Although the basis for this contention is unclear, Arevalo contends that the trial court erred by instructing the jury on the natural and probable consequences doctrine using CALCRIM No. 402.[7] According to Arevalo, certain language in the instruction

---

[7] The trial court instructed the jury using CALCRIM No. 402 as follows: "Defendant Aldo Arevalo is charged in count 2 with assault by means likely to produce great bodily injury and in count 1 with murder. [¶] You must first decide whether the defendant Arevalo is guilty of assault by means likely to produce great bodily injury. [¶] If you find the defendant is guilty of this crime, you must then decide whether he is guilty of murder. [¶] Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time. [¶] To prove that

22

created the "erroneous inference" that "if Amaya shot the victim for the same reason underlying the common plan to commit assault, then the homicide Amaya committed was the [natural and probable consequence] of the assault."

Arevalo's trial counsel did not object in the trial court to CALCRIM No. 402 based on the language with which Arevalo now takes issue. Instead, his trial counsel objected on the ground that the instruction applied only to Arevalo. Arevalo therefore forfeited this claim on appeal by not raising it in the trial court. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Moreover, to the extent Arevalo's claim can be fairly characterized as an assertion that CALCRIM No. 402 was ambiguous or unclear, he also forfeited that claim by failing to request clarifying language in the trial court. (*People v. Rundle* (2008) 43 Cal.4th 76, 151 ["failure to request clarification of an instruction that is otherwise a correct statement of the law forfeits an appellate claim of error based on the instruction given"].)

---

the defendant is guilty of murder, the people, and I'm referring to defendant Arevalo, the people must prove that: [¶] 1. The defendant is guilty of assault by means likely to produce great bodily injury. [¶] 2. During the commission of assault by means likely to produce great bodily injury, a co-participant in that assault by means likely to produce great bodily injury committed the crime of murder. [¶] And 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the assault by means likely to produce great bodily injury. [¶] A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. [¶] In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] If the murder was committed for a reason independent of the common plan to commit the assault by means likely to produce great bodily injury, then the commission of murder was not a natural and probable consequence of assault by means likely to produce great bodily injury."

23

### 5. CALCRIM No. 370

Arevalo claims that the trial court should not have instructed the jury on motive using CALCRIM No. 370. As Arevalo reads that instruction, it suggested to the jury that if Arevalo had a motive to confront and assault the victim, the jury could then assume that Arevalo was guilty of murder as an accomplice under the natural and probable consequences doctrine.

Arevalo did not object in the trial court to the instruction on motive or argue that the language of CALCRIM No. 370 was unclear or ambiguous. He therefore forfeited on appeal this claim of instructional error. (*People v. Virgil, supra,* 51 Cal.4th at p. 1260, *People v. Rundle, supra,* 43 Cal.4th at p. 151.)

### C. Ineffective Assistance of Counsel

Arevalo argues that if we determine that the trial court had no sua sponte duty to give certain instructions or that he forfeited one or more claims of instructional error, then he received ineffective assistance of counsel. "'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."' (*People v. Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169], quoting *Strickland v. Washington* [(1984)] 466 U.S. [668,] 686.) Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' (*People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212] quoting

*People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)  A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.  (*People v. Wilson*, *supra*, at p. 936; *People v. Pope*, *supra*, at p. 426.)"  (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

The record in this case sheds no light on the issue of why Arevalo's trial counsel failed to request the various instructions that he claims were necessary based on the evidence or why his trial counsel failed to object to or request clarifying instructions as to CALCRIM Nos. 402 and 370.  Moreover, we cannot determine on this record that there is no satisfactory explanation for his counsel's failure to request such instructions or to object to CALCRIM Nos. 402 and 370.  As to the instructions on the claimed lesser included offenses, his trial counsel may have determined that a given instruction was not warranted based on his view of the evidence or there may have been tactical reasons for not requesting a given instruction.  Similarly, there may have been tactical reasons for not objecting to or requesting clarification of CALCRIM Nos. 402 and 370.

> **D.**    **Constitutionality of the Natural and Probable Consequences Theory**

Arevalo asserts that California's accessory theory of liability under the natural and probable consequences doctrine violates the separation of powers doctrine and due process.  Therefore, he claims that the trial court committed constitutional error by instructing the jury on that theory.  In a footnote, Arevalo concedes that the Supreme Court has repeatedly endorsed the natural and probable consequences theory and that we are bound by those decisions.  (*People v. Prettyman, supra,* 14 Cal.4th at p. 260 ["Although the 'natural and probable consequences' doctrine has been 'subjected to substantial criticism (citations), it is an 'established rule' of American jurisprudence [citation]"]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Given this concession, we reject this contention without further discussion.

25

## E.     Cumulative Error

Arevalo maintains that the cumulative effect of the errors at trial which he challenges on appeal prejudiced him and warrants reversal.  Because we have determined that no such errors occurred at trial, we reject this claim as well.


## F.     Cruel and Unusual Punishment

Arevalo contends that his sentence of 40 years to life violates California's constitutional prohibition against cruel or unusual punishment.  Based on his view of the evidence, Arevalo concludes that his sentence is disproportionate to his crime because he had no adult criminal history, was unaware that Amaya was armed or intended to kill the victim, and otherwise had limited involvement in the actual murder of the victim.

The United States Constitution prohibits the imposition of cruel and unusual punishment (U.S. Const., 8th Amend.), and the California Constitution prohibits the imposition of cruel or unusual punishment (Cal. Const., art I, § 17).  The California and federal constitutional provisions have both been interpreted to prohibit a sentence that is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted; see also *Ewing v. California* (2003) 538 U.S. 11, 32-35; *Harmelin v. Michigan* (1991) 501 U.S. 957, 962.)  The federal constitutional standard is one of gross disproportionality.  (*Ewing v. California, supra,* 538 U.S. at p. 21; *Harmelin v. Michigan, supra,* 501 U.S. at p. 1001.)  Successful challenges to the proportionality of particular sentences have been very rare.  (*Rummel v. Estelle* (1980) 445 U.S. 263, 272; *Ewing v. California, supra,* 538 U.S. at p. 21 ["outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare"]; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 ["Findings of disproportionality have occurred with exquisite rarity in the case law"].)

The California Supreme Court has instructed that, when reviewing a claim of cruel or unusual punishment, courts should examine the nature of the offense and offender, compare the punishment with the penalty for more serious crimes in the same

jurisdiction, and measure the punishment to the penalty for the same offense in different jurisdictions. (*People v. Dennis* (1998) 17 Cal.4th 468, 511; *In re Lynch, supra,* 8 Cal.3d at pp. 425-427.) Defendant does not contend that his punishment is unconstitutional in the abstract, but as applied to him. Thus, defendant's argument addresses the first factor identified in *In re Lynch*—the nature of the offense and the offender. Regarding the nature of the offense and the offender, we evaluate the totality of the circumstances surrounding the commission of the current offenses, including the defendant's motive, the manner of commission of the crimes, the extent of the defendant's involvement, the consequences of his acts, and his individual culpability, including factors such as the defendant's age, prior criminality, personal characteristics, and state of mind. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

The nature of the offense and the offender in this case justify the sentence imposed on Arevalo by the trial court. The evidence of the shooting supported a reasonable inference that Arevalo's motive for the shooting was gang-related, i.e., to punish the victim for insulting a fellow gang member and falsely claiming to be a member of Grape Street. The evidence of the manner of commission of the crime showed that Arevalo agreed to engage in or support the ambush of the victim for the purpose of administering a gang "beat down" as punishment. And Arevalo's involvement in the crime was more extensive than he claims. Arevalo knowingly accompanied Amaya to the scene, exited the Camry with him, and approached the victim's vehicle at Amaya's side, evidence which suggests support of and deep involvement in the ambush and assault of the victim. The consequences of Arevalo's actions were serious; based on his support of and participation in the planned attack, the victim was trapped and vulnerable to the close range shooting. Although Arevalo may not have had actual knowledge of Amaya's intent to kill, the jury found based on substantial evidence that Arevalo should have expected that the assault would escalate to a killing due to the gang-related motive underlying the planned assault. Arevalo's personal culpability for the shooting was evident from his motive—to punish the victim for disrespecting his gang. Finally, although Arevalo may not have had an adult criminal history, he had a juvenile criminal history, and he

27

repeatedly admitted to the gang expert that he was a member of Grape Street, not a former member.

### G.	Multiple Conviction Rule and Double Jeopardy Principles

Amaya, joined by Arevalo, contends that the imposition of a section 12022.53, subdivision (d) firearms enhancement on a defendant convicted of murder violates the multiple conviction rule set forth in *People v. Ortega* (1998) 19 Cal.4th 686, 692-694 and *People v. Pearson* (1986) 42 Cal.3d 351, 355-360, as well as federal constitutional principles of double jeopardy.  According to Amaya, the factual element essential to establishing the section 12022.53, subdivision (d) enhancement—discharge of a firearm causing death—is necessarily consumed within the elemental components of murder—proximately causing death of the victim.

Amaya concedes, as he must, that two recent California Supreme Court decisions have rejected his contention under California's multiple conviction rule.  (*People v. Sloan* (2007) 42  Cal.4th 110, 115-125 and *People v. Izaguirre* (2007) 42 Cal.4th 126, 130-134.)  Because we are bound by those decisions under *Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at page 455, we reject Amaya's contention that his punishment violated California's multiple conviction rule.

Amaya also concedes that, historically, federal double jeopardy has not applied to multiple punishment within a unitary trial, but contends that recent United States Supreme Court decisions "suggest" that it now should.  Again, because there is California Supreme Court and United States Supreme Court authority holding that multiple criminal punishments that arise out of a unitary criminal proceeding do not implicate federal double jeopardy principles, *People v. Sloan, supra,* 42 Cal.4th at page 121, *Hudson v. United States* (1997) 522 U.S. 93, 99, we are bound to follow that authority and reject Amaya's double jeopardy contention.

28

**DISPOSITION**

The judgments of conviction are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

ARMSTRONG, Acting P. J.

KRIEGLER, J.

29